Meredith Holley, OSB No. 125647
Meredith@ErisResolution.com
Law Office of Meredith Holley
207 E 5th Avenue, Suite 254
Eugene, OR 97401
Phone: (458) 221-2671
Fax: (833) 352-3615
  Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| HOGON MULGRAVE,<br><br>　　　　Plaintiff,<br><br><br>　　vs.<br><br><br>EUGENE WATER & ELECTRIC BOARD, a public entity; FRANK LAWSON, an individual; JOHN LAUDERETTE, an individual; RAY PARKER, an individual; JASON STUART, an individual; SHANE BUCK, an individual, and DEFENDANTS DOE 1-10, individual decision-makers for Defendant EWEB;<br>　　　　Defendants. | Case No.  6:21-cv-01133<br><br>COMPLAINT<br>(Hostile Work Environment Racial Discrimination, Civil Rights Violations, Procedural Due Process Violations)<br><br><br>Demand for Jury Trial |

**INTRODUCTION**

1.

Oregon has a long and unique history of racism endorsed by its public entities. On

June 25, 1844, the Oregon territory's provisional government enacted its "Lash

COMPLAINT – Page 1

Law," requiring that Black people, whether enslaved or free, be whipped with thirty-nine lashes, every six months "until he or she shall quit the territory."[1]

2.

One of the earliest official documents from the Oregon territory was an Act titled "An Act to Prevent Negroes and Mulattoes from Coming to, or Residing in Oregon," passed on September 26, 1849.[2]

3.

On February 14, 1859, Oregon became the only state that entered the United States with a clause in its constitution forbidding Black people to live in its borders. It was not until 2001 that this clause was officially repealed.[3]

4.

On June 19, 1965, the National Holiday Juneteenth, when Black people in Texas learned that the United States had declared its intention to make Black people free citizens, Oregon's Black population was approximately only 0.2% of the overall Oregon population because of the state's success at excluding Black people from its borders.[4]

---

[1] *See* Walidah Imarisha, *A Hidden History*, Oregon Humanities Website (August 13, 2013), https://oregonhumanities.org/rll/magazine/skin-summer-2013/a-hidden-history/.
[2] *Id.*
[3] *Id.*
[4] Gibson, Campbell and Kay Jung, *HISTORICAL CENSUS STATISTICS ON POPULATION TOTALS BY RACE, 1790 TO 1990, AND BY HISPANIC ORIGIN, 1970 TO 1990, FOR THE UNITED STATES, REGIONS, DIVISIONS, AND STATES*, Table 52 (September 2002), https://www.census.gov/content/dam/Census/library/working-papers/2002/demo/POP-twps0056.pdf.

5.

In the 1920s, Oregon created and maintained the largest chapter of the Ku Klux Klan west of the Mississippi River, which included prominent members of Oregon's public entities.[5]

6.

Until the 1950s, Oregon law prohibited Black people from marrying white people.[6]

7.

From 1882 to 1968, white people perpetrated 4743 separate documented lynchings against Black people the United States, including in Oregon.[7] This means that approximately more than once a week for at least 80 years after the United States announced its intention to end slavery, white terrorist mobs hunted their Black neighbors in the United States.

8.

A lynching is a public act of terrorism in which a genocidal mob brutally murders an individual, usually hanging the body from a noose after the murder. Nooses are the most common symbol, threat, and weapon of lynchings against Black Americans.[8] In the United States, white people have used racial "cleansing" laws, like Oregon's exclusion laws and prohibition of inter-racial marriage, to justify genocidal lynching. At the turn of the 20th century, white terrorists sold postcards of the brutal lynchings of their Black neighbors, sometimes showing white people

---

[5] Millner, Darrell, *Blacks in Oregon*, Oregon Encyclopedia (last accessed July 26, 2021), https://www.oregonencyclopedia.org/articles/blacks_in_oregon/#the-civil-war-years-and-beyond.
[6] *Id.*
[7] NAACP, *History of Lynching in America*, History Explained (last accessed July 26, 2021), https://naacp.org/find-resources/history-explained/history-lynching-america.
[8] Alaa Elassar, *Why the noose is such a potent symbol of hate*, CNN (June 23, 2020), https://www.cnn.com/2020/06/23/us/noose-hate-symbol-racism-trnd/index.html.

having picnics underneath the mutilated corpses of their victims, who were hanging from nooses.[9] The confederate flag is also a symbol of white terrorist lynchings in the United States.[10]

9.

On June 5, 1934, seventeen legal scholars met in Germany to plan "how to institutionalize racism in the Third Reich," creating what was to become the Nuremburg Race Laws that began the Holocaust.[11] The scholars reviewed American history and laws for inspiration in writing their own.[12] Hitler noted the American "knack for maintaining an air of robust innocence in the wake of mass death" and admired the American custom of ritual torture and mutilation used in lynchings to maintain the separation and subordination of Black citizens in the United States.[13] However, ultimately the Nazi scholars determined that in some ways the laws of the United States were too racist for their taste.[14] For example, while Oregon defined a person as non-white for the purposes of exclusion if they were one-fourth Black, Nazi Germany decided to define a person as Jewish if they had two grandparents who were Jewish, making the person one-half Jewish.[15]

10.

The Nazi party of Germany adopted the swastika as the symbol of racial genocide against "non-Aryans," or anyone who was not white, and the swastika symbol has remained one of racial genocide since that time.[16] Since 1945, Germany has made

---

[9] Isabel Wilkerson, *Caste: The Origins of Our Discontent*, at 92-93 (2020 Random House).
[10] Jason Morgon Ward, *The Cause Was Never Lost*, The American Historian (last accessed July 26, 2021), https://www.oah.org/tah/issues/2015/november/the-cause-was-never-lost/.
[11] *Id.* at 78.
[12] *Id.* at 79-88.
[13] *Id.* at 81.
[14] *Id.* at 88.
[15] *Id.* at 88, 124.
[16] *The History of the Swastika*, United States Holocaust Memorial Museum (last accessed July 26, 2021), https://encyclopedia.ushmm.org/content/en/article/history-of-the-swastika.

public use of the swastika illegal because of its representation of racial terrorism.[17] Oregon public entities, such as Defendant EWEB, continue to endorse use of terrorist symbols like the swastika, arguing that, despite their threat of racial genocide, they constitute protected speech.

11.

As of 2021, still approximately only 2.79% of the population of Oregon is Black. Lane County, Oregon, where the events relevant to this complaint took place, reports approximately only 1.3% of its population as Black. Because of its historical exclusion laws and the endorsement of racism by its public entities, such as Defendant EWEB, Oregon is one of only 12 states in the United States with less 5% of its population comprised of Black people.[18]

12.

Defendant EWEB hired Plaintiff Hogon Mulgrave, a Black United States Citizen, originally from Jamaica, in 2010, with over 20 years of experience as an electrician. Defendant EWEB placed him in a position of meter reader, a position well below his experience and skills. Immediately, Defendant EWEB's employees and customers began to target Mr. Mulgrave based on his race and national origin. Defendant EWEB refused to promote Mr. Mulgrave for 10 years, repeatedly promoting less experienced white people instead of him. Defendant EWEB refused to act when its customers threatened Mr. Mulgrave's life with guns and called him a "nigger." Ultimately, one of Defendant EWEB's customers attempted to lynch Mr. Mulgrave by spraying him with chemicals and trying to light him on fire. At the age of 47, Mr. Mulgrave's physicians have restricted him

---

[17] *Id.*
[18] *Black Population by State 2021*, World Population Overview, (last accessed July 26, 2021), https://worldpopulationreview.com/state-rankings/black-population-by-state

from work, perhaps permanently, and are requiring him to undergo extensive medical treatment which may last the rest of his life.

13.

Defendant Lauderette refused to promote Mr. Mulgrave, specifically using racialized insults regarding promotion positions and targeting Mr. Mulgrave's national origin as a reason to refuse to promote. Defendant Parker unlawfully surveilled Mr. Mulgrave and disclosed private, humiliating details about racial harassment he experienced to his coworkers. Defendant Parker's surveillance of Mr. Mulgrave contributed to Defendant EWEB's refusal to promote Mr. Mulgrave.

14.

Defendants Lawson, Stuart, Buck, and the Doe Defendants contributed to Defendant EWEB's system of refusing to promote Mr. Mulgrave or provide structures to protect him from the harassment he experienced from Defendant EWEB's customers and employees. Defendants Stuart and Buck told Mr. Mulgrave meter readers could decline to read meters on unsafe properties. But, when Mr. Mulgrave tried to decline, Defendants Stuart and Buck reprimanded him that "other meter readers could get that read," and that he needed a doctor's note to avoid a route that was dangerous for Black people. Defendants EWEB, Lawson, Stuart, Buck, and Does 1-10 refused, and continue to refuse, to implement safety measures to make its meter readers, like Mr. Mulgrave, safe from harassment and discrimination based on the protected characteristics that are part of their identities.

**JURISDICTION AND VENUE**

15.

This matter arises under federal law, 42 U.S.C. § 1983 and 42 U.S.C. 2000e.

Supplemental jurisdiction over related state law claims is proper under 28 U.S.C.

§ 1367.

16.

The events underlying Plaintiff's claims took place in Lane County, Oregon,

making venue proper in the District of Oregon, Eugene Division.

**PARTIES**

17.

Plaintiff Hogon Mulgrave is a resident of Lane County, Oregon. Mr. Mulgrave is

a Black man. He is a United States citizen who immigrated from Jamaica. Mr.

Mulgrave is an electrician and holds a degree as an electrical technician.

18.

Defendant Eugene Water and Electric Board (EWEB) is a public entity providing

electrical and water services in Lane County, Oregon. Defendant EWEB boasts

on its website, "We believe part of what makes EWEB a great place to work is

our commitment to diversity and inclusion. We embrace and value differences of

culture, education, experience, physical ability and perspectives." Defendant

EWEB uses the tagline "Rely on <u>us</u>" in its materials.

19.

Upon information and belief, Defendant Frank Lawson is a resident of Lane

County, Oregon. Defendant Lawson became Defendant EWEB's General

Manager in 2016. Defendant Lawson is non-Black and has a Pacific Northwest accent. Defendant Lawson is sued in his individual capacity.

20.

Upon information and belief, Defendant Lauderette is a resident of Lane County, Oregon. Defendant Lauderette was the hiring supervisor for Defendant EWEB's electrical department at all times relevant to this complaint. Defendant Lauderette is non-Black and has a Pacific Northwest accent. Defendant Lauderette is sued in his individual capacity.

21.

Upon information and belief, Defendant Ray Parker is a resident of Lane County, Oregon. Defendant Parker was Defendant EWEB's Meter Reading Supervisor and Plaintiff Hogon Mulgrave's supervisor in 2017. Defendant Parker is non-Black and has a Pacific Northwest accent. Defendant Parker is sued in his individual capacity.

22.

Upon information and belief, Defendant Jason Stuart is a resident of Lane County, Oregon. Defendant Stuart is Defendant EWEB's Meter Reading Supervisor and became Plaintiff Hogon Mulgrave's supervisor beginning around 2017. Defendant Stuart is non-Black and has a Pacific Northwest accent. Upon information and belief, Defendant Stuart has worked for Defendant EWEB for more than 17 years. Defendant Stuart is sued in his individual capacity.

23.

Upon information and belief, Defendant Shane Buck is a resident of Lane County, Oregon. Defendant Buck is one of Defendant EWEB's Meter Reading Team Lead and assigned Mr. Mulgrave his work routes beginning around 2013. Defendant

Buck is non-Black and has a Pacific Northwest accent. Defendant Buck is sued in his individual capacity.

24.

Defendants Doe 1-10 are decision-makers for Defendant EWEB who made promotional decisions regarding Mr. Mulgrave's applications and/or determined Defendant EWEB's responses to Mr. Mulgrave's reports of race- and/or national-origin-based discrimination and/or determine Defendant EWEB's policies, trainings, and procedures related to racial harassment of meter readers. Upon information and belief, Defendants Doe 1-10 are residents of Lane County, Oregon, and are non-Black. Defendants Doe are sued in their individual capacity.

**FACTUAL ALLEGATIONS**

25.

In 2010, Defendant EWEB hired Plaintiff Hogon Mulgrave for a Utility Trades Internship. Mr. Mulgrave had more than 20 years of experience as an electrician with special certifications in hydraulic and pneumatic system repair. During his internship, approximately daily, employees referred to Mr. Mulgrave as "boy," rather than using his name. "Boy" is a word white terrorists use to assert power over Black people in the United States.

26.

When Mr. Mulgrave's internship was over, Defendant EWEB recommended Mr. Mulgrave apply for a temporary meter-reader position. On February 14, 2011, Defendant EWEB hired Hogon Mulgrave as a full-time meter reader. Defendant EWEB's employees and customers continued targeting Mr. Mulgrave because of

his race and/or national origin from his hire date to when his doctors restricted him from work as described more fully below.

27.

Approximately every day after Mr. Mulgrave started working for Defendant EWEB, and reducing to approximately once a week by the time he was forced out of his position in 2020, Defendant EWEB's employees made derogatory comments regarding Mr. Mulgrave's Jamaican accent. For example, they said, "Take the peanut butter out of your mouth," "People don't want to work with you because they can't understand you," or they simply turned their backs on Mr. Mulgrave while he was talking and walked away. The national language of Jamaica is English and Mr. Mulgrave speaks English as clearly as any native English speaker. The employees who targeted Mr. Mulgrave have Pacific Northwest accents.

28.

In 2010, when Mr. Mulgrave first worked for Defendant EWEB, there was another employee who was a Black man. The other Black man told Mr. Mulgrave that while he was working in the parts storeroom, two non-Black coworkers confronted him and one threw a lynching weapon over a steampipe, saying, "You know what we use nooses for." The other Black employee was terrified, but able to escape from the storeroom. He reported this incident to his supervisor, who did nothing. He then reported to Defendant EWEB's Human Resources Department. Upon information and belief, the two non-Black employees received only a verbal reprimand after threatening a Black employee's life. One of the non-Black employees who threatened his coworker's life continues to work at Defendant EWEB as of the filing of this Complaint.

29.

Also in 2010, an EWEB employee, approached Mr. Mulgrave and said, in front of a supervisor, "You look like a terrorist." This comment clearly stereotyped Mr. Mulgrave as dangerous because of his race and/or national origin. Defendant EWEB did not respond to this incident or discipline this employee.

30.

Also in 2010, a different Black coworker of Mr. Mulgrave's was the only Black electrician for Defendant EWEB. The Black coworker went into a substation and saw a lynching weapon hanging from pipes. He cut the weapon down and reported it to Defendant EWEB's Human Resources Department. The HR representative said, "What are we supposed to do about it?" Upon information and belief, there were security cameras, log books, work orders, and dispatch records that could have determined who put the weapon in the substation. Upon information and belief, no one was disciplined for this incident.

31.

On or around July 7, 2011, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Utility Mechanic. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB promoted a white man with a Pacific Northwest accent instead.

32.

On or around October 25, 2011, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Utility Worker. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a white man with a Pacific Northwest accent instead. The hiring supervisor, Defendant John Lauderette, explained to Mr. Mulgrave why he hired the white man, saying, "I can't

understand you because of your accent," and "I want to find someone who matches the culture of the department." The "culture" of the department consisted of white people with Pacific Northwest accents. Defendant Lauderette refused to recognize Mr. Mulgrave's education saying he would not recognize training in Jamaica. At the same time, however, the Defendant Lauderette said, "I could train a monkey to do this job." Comparing Black people to primates is a historical justification for racial exclusion laws and slavery. Defendant Lauderette's reference to training a monkey appeared to be a racial slur against Mr. Mulgrave.

33.

On or around December 8, 2011, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Building Maintenance Technician II. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a white man with a Pacific Northwest accent instead.

34.

On or around January 6, 2012, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Utility Installer. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a white man with a Pacific Northwest accent instead.

35.

On or around August 10, 2012, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Utility Worker. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a white man with a Pacific Northwest accent instead.

36.

On or around November 9, 2012, Mr. Mulgrave applied for a promotion within
Defendant EWEB to become a Meter Relay Technician Trainee. Defendant
EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a
white man with a Pacific Northwest accent instead.

37.

On or around July 25, 2013, Mr. Mulgrave applied for a promotion within
Defendant EWEB to become a Utility Worker. Defendant EWEB did not hire Mr.
Mulgrave for that position. Defendant EWEB hired a white man with a Pacific
Northwest accent instead. When Mr. Mulgrave asked Defendant EWEB why he
was not hired, Defendant EWEB's hiring committee told Mr. Mulgrave he was
not hired because his accent was difficult to understand in the interview.

38.

Also in 2013, Mr. Mulgrave was working on a route for Defendant EWEB. He
was parked at an EWEB customer's home, when children stole tools from his
truck. A woman who said she was the children's grandmother approached Mr.
Mulgrave, threw the tools at him, striking the truck, and yelled, "Get off my
property, nigger! We don't have your kind up here!" Mr. Mulgrave called his
team lead, who asked Defendant EWEB to shut the power off for the customer
because of the race-based, violent assault. Defendant EWEB refused to shut the
power off for that customer. Mr. Mulgrave asked to move to a different
department because he was not safe as a meter reader. Defendant EWEB did not
respond to his request or transfer him. Defendant EWEB required Mr. Mulgrave
to return to this route that year and then throughout his employment, despite
Defendant EWEB's customer's attack against Mr. Mulgrave.

COMPLAINT – Page 13

39.

Around 2013, Defendant Shane Buck began assigning meter routes to the meter readers. He assigned Mr. Mulgrave a disproportionate amount of unfavorable work compared to other meter readers throughout the rest of Mr. Mulgrave's time working for Defendant EWEB.

40.

On January 31, 2014, Defendant EWEB issued Mr. Mulgrave a performance review marking him as "skilled" or "exceptionally skilled" in every category. Defendant EWEB remarked, "Hogon is excellent when dealing with our customers. Even under highly tense circumstances. He has received customer compliments in regard to his professionalism. He also kept his cool when dealing with a difficult customer who verbally and racially assaulted him. Throughout the encounter Hogon kept his cool where others might have snapped and responded improperly." (Emphasis added.) Defendant EWEB recognized Mr. Mulgrave's exceptional skills in dealing with racial harassment and discrimination, but refused to promote him or create a safe working environment, free from racial harassment.

41.

Around 2014 the only other Black and Jamaican employee left the meter-reading department at Defendant EWEB, and Mr. Mulgrave became the only Black meter reader and the only person in his department with a Jamaican national origin.

42.

On or around May 7, 2015, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Customer Service Field Representative. Defendant

EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a white man with a Pacific Northwest accent instead.

43.

On or around July 3, 2015, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Fleet Technician/Equipment Mechanic. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a white man with a Pacific Northwest accent instead.

44.

On or around October 22, 2015, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Station Wire Technician Apprentice. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB hired a white man with a Pacific Northwest accent instead.

45.

Also in 2015, Mr. Mulgrave, in the course of his duties with Defendant EWEB, read a meter for a customer. The customer complained to Defendant EWEB that Mr. Mulgrave had an accent. Later in 2015, Mr. Mulgrave returned to that same meter to read it. The EWEB customer said, "I don't want you on my property because you're a nigger." Mr. Mulgrave called 911 when he realized the situation was dangerous. The EWEB customer showed Mr. Mulgrave that he had a gun and held Mr. Mulgrave hostage. Mr. Mulgrave was not free until a Sheriff's Deputy arrived. Mr. Mulgrave showed Defendant EWEB a video he took of this incident. Defendant EWEB took no action regarding the EWEB customer's attack. Mr. Mulgrave asked to be protected from returning to this route, but Defendant EWEB required him to return to this route later that year and throughout his employment.

46.

On or around May 20, 2016, Mr. Mulgrave applied for a promotion within
Defendant EWEB to become a Customer Service Field Representative. Mr.
Mulgrave was performing fill-in work for this position at the time he applied.
Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB
hired a white man with a Pacific Northwest accent instead. Nevertheless,
Defendant EWEB continued to ask Mr. Mulgrave to fill in for this position at a
lower rate of pay.

47.

In late 2016 or early 2017, Mr. Mulgrave's son became very ill with a serious
health condition that required multiple visits to a doctor. Mr. Mulgrave notified
Defendant EWEB of his son's illness and his need to be available for medical
appointments and contacts from his son. Mr. Mulgrave's situation qualified for
protections under the Oregon Family Leave Act and the Family Medical Leave
Act.

48.

On March 31, 2017, Mr. Mulgrave's supervisor, Defendant Ray Parker, told Mr.
Mulgrave he needed to meet in the Human Resources Department at the end of
his shift. Mr. Mulgrave complied. In the meeting, Defendant Parker told Mr.
Mulgrave that he had surveilled Mr. Mulgrave's vehicle. He accused Mr.
Mulgrave of "idle time." Mr. Mulgrave explained that because of his son's serious
health condition he had medical leave protections and sometimes he needed to
answer a phone call from his son. Mr. Mulgrave had never been accused of failing
to complete his work and Defendant Parker did not note any failures in Mr.

Mulgrave's work product. Upon information and belief, Defendant Parker did not surveil Mr. Mulgrave's non-Black coworkers.

49.

On April 3, 2017, Defendant Parker gave Mr. Mulgrave a formal reprimand based on Defendant Parker's surveillance of Mr. Mulgrave. Mr. Mulgrave told Defendant Parker about his son's serious health condition and his protected medical leave, but Defendant Parker would not consider it. Defendant Parker suspended Mr. Mulgrave for that day. He then required Mr. Mulgrave to clock in and out for every break. He required Mr. Mulgrave to write down phone call times with Mr. Mulgrave's son to precisely deduct the time from his paid time. He gave Mr. Mulgrave "Brief Relief" urinal bags and told him to use those bags when he was out on a route. Upon information and belief, Defendant Parker did not set these requirements for non-Black workers or workers with Pacific Northwest accents.

50.

On April 4, 2017, Defendant Parker held a staff meeting for all of Defendant EWEB's meter readers. He announced to the entire staff that Mr. Mulgrave had been called a "nigger" by an EWEB customer in the course of instructing Mr. Mulgrave's coworkers about how to report EWEB customer abuse. Mr. Mulgrave's coworkers did not know about the incidents in which customers threatened and attacked Mr. Mulgrave, using derogatory slurs, and Mr. Mulgrave had not shared the incident with Defendant Parker. This release of details about Mr. Mulgrave's personal, humiliating experience exposed him to additional questions and stigmatization among his coworkers.

51.

In June 2017, Defendant Lawson eliminated Defendant EWEB's diversity, equity, and inclusion committee and terminated a large portion of Defendant EWEB's employees who were people of color. At that time, Defendant EWEB terminated its only Black electrician. It continued to pay non-Black contract workers to do this former employee's work.

52.

On or around August 3, 2017, Mr. Mulgrave applied for a promotion within Defendant EWEB to become an Apprentice Electric Meter Technician. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB's hiring supervisor, Defendant John Lauderette, told Mr. Mulgrave that Defendant EWEB would not recognize his degree because it was from Jamaica. Mr. Mulgrave also had relevant education in the United States, however, which Defendant EWEB likewise refused to consider. Defendant EWEB's supervisor said he wanted "someone who fit the culture," and again said he could "train a monkey" to do the job, referring to the derogatory stereotype of comparing Black people to primates, which has been historically used to justify slavery. Defendant EWEB hired a non-Black applicant with a Pacific Northwest accent instead.

53.

On or around September 7, 2017, Mr. Mulgrave applied for a promotion within Defendant EWEB to become a Single-Phase Meter Technician. Defendant EWEB had three positions open for Single-Phase Meter Technicians. Defendant EWEB's hiring supervisor, Defendant John Lauderette, told Mr. Mulgrave that Defendant EWEB would not recognize his degree because it was from Jamaica. Mr. Mulgrave also had relevant education in the United States, however, which

Defendant EWEB likewise refused to consider. Defendant EWEB's supervisor said he wanted "someone who fit the culture," and again said he could "train a monkey" to do the job, referring to the derogatory stereotype of comparing Black people to primates, historically used to justify slavery. Defendant EWEB hired all white men with Pacific Northwest accents instead.

54.

On December 5, 2017, Mr. Mulgrave filed a complaint with the Oregon Bureau of Labor and Industries and Equal Employment Opportunity Commission, complaining of the discrimination he was experiencing based on his race and national origin.

55.

On or around August 1, 2018, Mr. Mulgrave applied for a promotion within Defendant EWEB to become an Electric Meter Technician. Defendant EWEB had five positions open for Electric Meter Technicians. Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB's hiring supervisor, Defendant John Lauderette, told Mr. Mulgrave that Defendant EWEB would not recognize his degree because it was from Jamaica. Mr. Mulgrave also had relevant education in the United States, however, which Defendant EWEB likewise refused to consider. Defendant Lauderette said he wanted "someone who fit the culture," and again said he could "train a monkey" to do the job, referring to the derogatory stereotype of comparing Black people to primates, historically used to justify slavery. Defendant EWEB hired all white men with Pacific Northwest accents instead.

56.

Also in 2018, in the course of his duties for Defendant EWEB, Mr. Mulgrave was approaching a meter, when a customer ran to him, demanding to see his identification. The customer said, "You know I could shoot you on my property." Mr. Mulgrave reported this incident to Defendant EWEB. Defendant EWEB has easements on property leading to any meter it owns, making a meter-reader's entry to read a meter lawful. Defendant EWEB did not notify this customer or other customers of this easement or take any other action regarding the safety of its Black workers, including Mr. Mulgrave.

57.

On January 9, 2019, Mr. Mulgrave's Black coworker told him that non-Black coworkers openly use derogatory terms to describe people of African heritage like "spearchucker" in his presence. He said that he had also heard white coworkers say, "I could train a monkey to do this job," referring to the derogatory comparison white terrorists make between Black people and monkeys to attempt to justify slavery.

58.

On February 12, 2019, at a safety meeting for Defendant EWEB, a supervisor, instructing meter readers on "de-escalation with customers," said that Defendant EWEB could take action towards customers for mistreatment of employees. Mr. Mulgrave reported that Defendant EWEB had not taken action towards customers, even when his life was threatened. A coworker clarified in the meeting that Mr. Mulgrave had been threatened by customers because of their racism. Still Defendant EWEB took no action towards these customers and provided no training regarding safety from discriminatory and harassing customers.

59.

On March 1, 2019, Mr. Mulgrave's coworker approached him and said he had

reported to Defendant EWEB that he believed electrical journeymen were being

hired over Mr. Mulgrave without the qualifications Mr. Mulgrave had.

60.

On April 16, 2019, in the course of his duties for Defendant EWEB, Mr.

Mulgrave approached one of Defendant EWEB's meters. A woman left the house

and said, "What are you doing in this neighborhood? Are you scoping the

neighborhood to come steal stuff later?" Mr. Mulgrave and a white coworker

reported this comment and that it was racist to Defendant EWEB. Defendant

EWEB took no action.

61.

Approximately 2 to 4 times per year, while Mr. Mulgrave worked for Defendant

EWEB, police stopped Mr. Mulgrave, saying that because he was Black, EWEB

customers in the area called 911, claiming that a Black man was impersonating an

EWEB meter reader, attempting to break into homes. In the United States, police

forces began as slave patrols, charged with enforcing slavery. Police continue to

be a leading cause of death for Black men as of the date of this Complaint and a

weapon that white terrorists use against their Black neighbors.

62.

For example, in late spring or early summer of 2019, a coworker called Mr.

Mulgrave saying, "A cop just rolled up saying he's looking for someone

impersonating an EWEB reader. They said they're looking for a black guy with a

shaved head and a white guy." Mr. Mulgrave was working with a white meter

reader. Shortly after that, law enforcement pulled up to where Mr. Mulgrave was

finishing his meter reads. The officer said, "What are you doing in the neighborhood? Get down on the ground and put your hands on the sidewalk!" Mr. Mulgrave complied. The officer demanded he show his ID. Mr. Mulgrave was terrified because his ID was in the EWEB truck he was driving. He explained to the officers that he could not show his ID because he had his hands on the ground and it was in his truck. The officers looked in the truck and acknowledged he was an official employee of Defendant EWEB. The officers left.

63.

The officers did not require Mr. Mulgrave's white coworker to lay on the ground while they investigated his truck.

64.

Mr. Mulgrave reported this, and the other encounters in which Defendant EWEB's customers used the police to harass him while on the job, to his supervisors, but Defendant EWEB took no steps to correct the ongoing safety issue. For example, Defendant EWEB did not notify its customers or law enforcement that Mr. Mulgrave was its employee or that he would be reading their meter, in order to protect him from potentially life-threatening encounters with law enforcement.

65.

In 2019, in the course of his duties with Defendant EWEB in Lane County, Oregon, Mr. Mulgrave arrived at a business that was an EWEB customer. The owner of the business left the business and confronted Mr. Mulgrave, showing Mr. Mulgrave that he had a gun on his hip. He said, "Why were you speeding, nigger?! Did you see my dog, nigger?!" Mr. Mulgrave was not speeding. Mr. Mulgrave reported to Defendant EWEB that this customer called him a racial slur

while showing a weapon, and Defendant EWEB took no action to correct the customer.

66.

Later in 2019, in the course of his duties with Defendant EWEB in Lane County, Oregon, Mr. Mulgrave drove onto an EWEB customer's property. The customer left his house and ran up to Mr. Mulgrave holding a 0.357 Magnum gun in his hand, saying Mr. Mulgrave was trespassing. Mr. Mulgrave reported this incident to his supervisor. Defendant EWEB continued to require Mr. Mulgrave to read this meter and refused to allow a "radio read." Only after this EWEB customer threatened Mr. Mulgrave with a gun five more times did Defendant EWEB agree to a "radio read" at this property. A meter shop coworker justified the attacks saying, "He's just a good ol' boy protecting his property." The term "good ol' boy" is often used to describe white terrorists.

67.

Upon information and belief, between 2010 and 2020, Mr. Mulgrave's non-Black coworkers have not been held at gunpoint during the course of their duties with Defendant EWEB.

68.

Upon information and belief, between 2010 and 2020, Defendant EWEB has offered counseling services to meter readers who have been confronted by dogs or angry customers in the course of their duties with Defendant EWEB. Defendant EWEB did not offer that option to Mr. Mulgrave at any time regarding an incident of racial harassment or violence.

69.

Mr. Mulgrave has never heard anyone call him "nigger" outside of performing his

duties with Defendant EWEB.

70.

On June 18, 2019, the employee of Defendant EWEB who called Mr. Mulgrave a

terrorist when Defendant EWEB first hired him, displayed posters in the central

offices of Defendant EWEB supporting Donald Trump in the presidential race.

One of the posters appears to show Donald Trump surfing on blood. The other

shows Donald and Melania Trump brandishing guns like those EWEB's

customers used to threaten Mr. Mulgrave. Upon information and belief,

Defendant EWEB did not discipline this employee. On July 4, 2021, this same

employee of Defendant EWEB used public money to organize a march of the

Proud Boys, a white terrorism organization, in Lane County, Oregon. Upon

information and belief, she was still an EWEB employee at that time or recently

retired and is one of the openly racist employees EWEB never disciplined for

racial harassment or discrimination.

71.

On or around August 5, 2019, Mr. Mulgrave applied for a promotion within

Defendant EWEB to become an Apprentice Electrical Meter Technician.

Defendant EWEB did not hire Mr. Mulgrave for that position. Defendant EWEB

hired white people with Pacific Northwest accents instead of Mr. Mulgrave. Both

of the people hired for the open positions were people with less experience than

Mr. Mulgrave. Mr. Mulgrave had trained both of the people promoted above him

for Defendant EWEB. When Mr. Mulgrave asked why he was not hired, the

hiring supervisors said that the reprimand from Defendant Parker related to Mr.

Mulgrave's protected medical leave had impacted his ability to be hired since the date of the reprimand.

72.

On September 5, 2019, Mr. Mulgrave again filed charges with the Oregon Bureau of Labor and Industries and Equal Employment Opportunity Commission for race and national-origin-based discrimination.

73.

In November 2019, Mr. Mulgrave was in a meeting in Defendant EWEB's offices, when an older, white, female coworker entered the meeting and sat down. She turned to Mr. Mulgrave and snapped him, "What are you looking at you big black jerk?" Other colleagues in the meeting seemed shocked and redirected the meeting. Later that day, Mr. Mulgrave reported the incident to Defendant Stuart. The next day, Defendant Stuart approached Mr. Mulgrave, saying that rather than investigate the white coworker's racist attack on Mr. Mulgrave, Defendant EWEB was investigating the way Mr. Mulgrave looked at the coworker in the meeting. The white coworker was never reprimanded for her racial harassment during the meeting.

74.

On January 6, 2020, in the course of his duties with Defendant EWEB in Lane County, Oregon, Mr. Mulgrave worked a new route. He walked towards the meters at a house and saw a group of white men sitting in a garage. In the garage hung a confederate flag, a Ku Klux Klan flag, a Nazi flag, and 4 lynching weapons. Mr. Mulgrave called Defendant Buck, who assigned meter-reading routes for Defendant EWEB and reported what he saw. Mr. Mulgrave said he was afraid to read the meter at the house because of the racist symbols and weapons

COMPLAINT – Page 25

present. Defendant Buck told Mr. Mulgrave, "If you don't want to be on that route, you need a doctor's excuse."

75.

On January 7, 2020, Mr. Mulgrave asked Defendant Stuart to arrange for Defendant EWEB to do "radio reads," or remotely read the meters for Defendant EWEB's customers who exhibit openly racist symbols and/or weapons on their properties like the January 6 customers. Defendant Stuart refused to "radio read" homes with lynching symbols and weapons. Defendant Stuart told Mr. Mulgrave Defendant EWEB's leadership, including Defendant Lawson and Defendants Doe 1-10, would not allow him to take steps to protect meter readers from customers who threatened their safety and harassed them based on race by performing "radio reads" for those customers. In the past, at least one other supervisor had routinely performed "radio reads" on dangerous homes, and it appeared Defendant Stuart was choosing to refuse this safety measure to Mr. Mulgrave or Defendant EWEB's leadership was suddenly forcing Defendant Stuart to refuse to provide this safety measure.

76.

On January 8, 2020, in the course of his duties with Defendant EWEB, an aggressive dog lunged at Mr. Mulgrave and almost bit him. Mr. Mulgrave reported this incident to Defendant Buck. Defendant Buck said, "Other coworkers have gotten the read. This is meter reading 101!" as though it was Mr. Mulgrave's fault the dog had tried to attack him. Throughout the time Defendant Buck assigned meter reader routes, approximately one time per month, Mr. Mulgrave faced an unsafe condition on a property and reported it to Defendant Buck. Each time, Defendant Buck required Mr. Mulgrave to give an explanation. Each time, if

Defendant Buck did not agree with Mr. Mulgrave's evaluation of the danger, he warned Mr. Mulgrave that if he did not read the meter, it would count against Mr. Mulgrave in his performance review.

77.

On January 9, 2020, Defendant Buck called Mr. Mulgrave into his office and accused Mr. Mulgrave of being "aggressive" when Mr. Mulgrave attempted to get help from Defendant Buck about the dog who almost attacked him. This description was not accurate, but instead stereotyped Mr. Mulgrave based on his race and failed to respond to the serious safety issue he reported.

78.

On January 13, 2020, Defendant's HR representatives met with Mr. Mulgrave. They told him that Defendant EWEB's customers would not be required to remove racist symbols from their property in order to receive in-person meter reading services, rather than radio reads. Defendant Stuart on behalf of Defendant EWEB told Mr. Mulgrave that lynching symbols and weapons displayed on a home do "not warrant a danger warning." Although Mr. Mulgrave had seen other meters put on "radio read" for various reasons, Defendant EWEB specifically refused to take this action regarding the EWEB customers Defendant EWEB required Mr. Mulgrave to encounter on January 6, 2020. Defendant EWEB told Mr. Mulgrave that "staff are not required to obtain meter readings on services where they feel their safety is at risk," but at the same time determined lynching weapons are not a "danger," and reprimanded Mr. Mulgrave when a dog attempted to attack him and he chose safety. Defendant EWEB gave lip service to its meter readers', including Mr. Mulgrave's, safety but then refused to create a safe working environment for Mr. Mulgrave, safe from racial harassment.

79.

On Friday, May 15, 2020, in the course of his duties with Defendant EWEB, Mr.

Mulgrave entered a neighborhood off of Coburg Road, in Eugene, Oregon, a little

before 9:00 a.m. to read meters. An EWEB customer ran out of his house towards

Mr. Mulgrave, yelling, "What are you doing in my neighborhood?! I don't want

niggers in my neighborhood!"

80.

The EWEB customer crossed the street toward Mr. Mulgrave, opening and

closing a switchblade knife in his hand. The EWEB customer waived the knife at

Mr. Mulgrave yelling, "I'm going to cut your head, fingers, and feet off so they

can't identify your body!" Mr. Mulgrave called 911, and the man went back into

his house for a moment. Mr. Mulgrave saw that there were three other men at the

windows of the man's house, watching the incident. Mr. Mulgrave was afraid

they could all leave the house to attack him. Having heard the noise, one of Mr.

Mulgrave's coworkers approached him from another street and witnessed the

attack.

81.

The EWEB customer left the house again, yelling, "I'm going to kill you, nigger!"

He yelled the word "nigger" at Mr. Mulgrave approximately 30-40 times. He

yelled "I'm going to kill you!" approximately 10 times. The EWEB customer

again went back into the house.

82.

The EWEB customer left the house again, and ran across the street carrying a

spray can of chemicals. He had the switchblade in his other hand with a lighter.

The EWEB customer ran to Mr. Mulgrave and sprayed him with the can of

COMPLAINT – Page 28

chemicals, yelling, "I'm going to light you on fire, nigger!" He flicked the lighter, and flicked the lighter again, but it did not light. The EWEB customer grabbed Mr. Mulgrave's hand in a tight grip, yelling, "I'm going to kill you, nigger!" When the lighter would not light, the EWEB customer ran back into his house, continuing to yell at Mr. Mulgrave that he was a "nigger."

83.

The EWEB customer left the house again, yelling that he would murder Mr. Mulgrave and continuing to call him racial expletives. Mr. Mulgrave turned to his coworker and said, "If I get killed, tell my family I was doing my job."

84.

Eventually, law enforcement arrived and arrested the EWEB customer. That same day, Friday, May 15, 2020, Mr. Mulgrave and the coworker who was with him reported the incident to the police and to Defendant EWEB.

85.

Mr. Mulgrave returned to Defendant EWEB's office, but no one was present from Defendant EWEB to verify his safety.

86.

Defendant EWEB did not communicate with Mr. Mulgrave about his report on Saturday, May 16, 2020.

87.

Defendant EWEB did not communicate with Mr. Mulgrave about his report on Sunday, May 17, 2020.

88.

On Monday, May 18, 2020, having heard nothing from Defendant EWEB, Mr. Mulgrave returned to work. When Defendant Buck saw Mr. Mulgrave, he laughed

and said, "Why does this always happen to you, Hogon?" ignoring that Mr.
Mulgrave asked for help repeatedly regarding racial violence he experienced as an
employee of Defendant EWEB. Another non-Black coworker also said to Mr.
Mulgrave that day, "Why does this always happen to you, Hogon?" as though
Defendant EWEB's failure to create a safe working environment, free from racial
harassment, was his fault.

89.

On Mr. Mulgrave's lunch break, Mr. Mulgrave called a friend and told her his
heart was racing and he did not feel well. His friend was worried that he could
have a heart attack from the stress of the attack and failure of Defendant EWEB to
create a safe work environment. Mr. Mulgrave decided to see a doctor.

90.

On May 19, 2020, Mr. Mulgrave filed for workers' compensation, and the claim
was accepted. Still, Defendant EWEB did nothing to support Mr. Mulgrave or
take action to prevent EWEB customers from attacking meter readers in the future
because of their race.

91.

On July 2, 2020, the EWEB customer who attempted to light Mr. Mulgrave on
fire was charged with Bias Crime in the First Degree. Defendant EWEB did not
appear at any court proceedings or offer support to Mr. Mulgrave through the
criminal court process.

92.

On June 30, 2020, Governor Kate Brown signed into law HB 4212, extending
statutes of limitations during state of emergency for COVID-19, which began on
March 7, 2020.

COMPLAINT – Page 30

93.

On July 28, 2020, Mr. Mulgrave's therapist diagnosed him with Complex PTSD from the years of racial trauma he experienced working for Defendant EWEB and Defendant EWEB's refusal to create a safe working environment, free from racial harassment and discrimination.

94.

On August 4, 2020, Defendant EWEB's Board of Commissioners adopted a resolution stating that Defendant EWEB would only protect its meter readers from racial or sexual harassment from customers by installing Smart Meters, which allow for "radio reads" that do not require meter readers to expose themselves to harassment, if "a condition on the property or conduct of the customer, or anyone under the customer's reasonable control, <u>significantly affects the employee's ability to perform work functions due to a protected status</u>." (Emphasis added.)

95.

On September 18, 2020, Mr. Mulgrave again filed charges with the Oregon Bureau of Labor and Industries and the Equal Employment Opportunity Commission for race and national-origin based harassment and discrimination.

96.

On October 12, 2020, the EWEB customer who tried to light Mr. Mulgrave on fire was found guilty of the Bias Crime in Lane County Circuit Court. Still, Defendant EWEB took no action to support Mr. Mulgrave or prevent future hate crimes against Black meter readers in the future.

97.

On November 2, 2020, Mr. Mulgrave provided Defendant EWEB notice of tort claim under ORS 30.275.

98.

On November 12, 2020, the parties entered into a 60-day tolling agreement.

99.

On February 1, 2021, a defense medical examination paid for by Workers' Compensation insurance concurred with Mr. Mulgrave's treatment providers that he is disabled and not capable of regular work. Mr. Mulgrave was 47 years old at the time of the examination.

100.

On June 7, 2021, Oregon passed House Bill 2337, declaring racism a public health emergency, recognizing:

> Whereas racism is pervasive and is integrated into every institution and system that is connected to the social determinants of health, and ultimately impacts each Oregonian's ability to be healthy and well to the fullest potential; and
>
> Whereas incidents of racism consistently experienced by Black and indigenous communities, people of color and tribes create racial disparities in social, health, economic, legal and academic outcomes; and
>
> Whereas white supremacy was institutionalized through the development of policies and systems that ensure power, privilege and resources remain in the hands of white men; and

Whereas racism in Oregon has left a legacy of trauma from one generation to the next, impacting Oregon tribes, Black and indigenous communities and people of color through a cumulative effect; and

Whereas Oregon has deep roots of racism, including the Donation Land Act of 1850 that made it legal to steal land from Native American tribes, the 1887 murder of Chinese miners, Black exclusionary laws with lashing as punishment, Japanese internment camps during World War II, segregation in education and real estate red-lining that drove down values and reduced home ownership in the Black community; and

Whereas racial justice requires the formation and purposeful reinforcement of policies, practices, ideologies and behaviors that create equitable power, access, opportunity, treatment and outcomes for all people regardless of race and redistribute resources to invest where inequities are greatest; and

Whereas racism in Oregon and nationwide has created a situation that is untenable and where immediate action must be taken to mitigate further harm and violence against Black and indigenous Oregonians, people of color and tribes; now, therefore,

Be It Enacted by the People of the State of Oregon:

SECTION 1. The Legislative Assembly declares that racism is a public health crisis in this state.

101.

July 28, 2021, the Bureau of Labor and Industries issued Mr. Mulgrave a 90-day right to sue letter.

102.

Defendants' actions and inactions have caused Mr. Mulgrave extreme losses including a diagnosis of Complex PTSD and anxiety disorder requiring medical treatment which his providers estimate will continue for the rest of his life. Compensation for Mr. Mulgrave's past and future medical treatment should be determined by a jury at trial.

103.

Defendants' actions and inactions have caused Mr. Mulgrave extensive wage loss. In addition to the wage loss Mr. Mulgrave suffered from Defendant EWEB's refusal to promote him, Mr. Mulgrave has now been restricted from work entirely, which may lead to 20 years of wage loss. Compensation for Mr. Mulgrave's wage loss should be determined by a jury at trial.

104.

Beyond the financial harm Defendants' actions and inaction have caused Mr. Mulgrave severe emotional harm, fear for his life over and over while trying to do his job, panic, hypervigilance, and the betrayal of having an employer to whom he dedicated a decade of his life refuse to create a safe working environment free from discrimination. Mr. Mulgrave fears going into normal grocery stores and has been forced to leave because of the panic at being in the presence of too many customers. Mr. Mulgrave fears returning to the areas of Lane County where his life was threatened or approaching anywhere near the EWEB offices where he was ridiculed instead of supported for the racial trauma he suffered. Compensation for Mr. Mulgrave's emotional harm should be determined by a jury at trial.

### FIRST CLAIM FOR RELIEF – TITLE VII
### HOSTILE WORK ENVIRONMENT PROTECTED CHARACTERISTIC HARASSMENT
### (AGAINST DEFENDANT EWEB)

105.

Plaintiff repeats and realleges paragraphs 1-104 as though fully set forth.

106.

Defendant violated Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, *et seq.,* by subjecting Plaintiff to discriminatory slurs, violence, differential treatment, and other unwanted, offensive verbal or physical conduct based on Plaintiff's race and/or national origin, as described above, which was severe or pervasive enough to alter the conditions of Plaintiff's employment and create a work environment that a reasonable person in plaintiff's circumstances would consider to be abusive or hostile enough to alter the conditions of Plaintiff's employment. Plaintiff perceived the environment to be abusive or hostile. Defendant and/or members of Defendant's management knew or should have known of the harassment and failed to take immediate, appropriate remedial action reasonably calculated to end the harassment as described above, culminating in Defendant forcing Plaintiff out of his job because it refused to create a work environment free from race-based harassment.

107.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe

from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

108.

Under Title VII, 42 U.S.C. § 2000e-2, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

### SECOND CLAIM FOR RELIEF – ORS 659A.030
### HOSTILE WORK ENVIRONMENT PROTECTED CHARACTERISTIC HARASSMENT
### (AGAINST DEFENDANT EWEB)

109.

Plaintiff repeats and realleges paragraphs 1-108 as though fully set forth.

110.

Defendant violated ORS 659A.030 by subjecting Plaintiff to discriminatory slurs, violence, differential treatment, and other unwanted, offensive verbal or physical conduct based on Plaintiff's race and/or national origin, as described above, which was severe or pervasive enough to alter the conditions of Plaintiff's employment and create a work environment that a reasonable person in plaintiff's circumstances would consider to be abusive or hostile enough to alter the conditions of Plaintiff's employment. Plaintiff perceived the environment to be abusive or hostile. Defendant and/or members of Defendant's management knew or should have known of the harassment and failed to take immediate, appropriate remedial action reasonably calculated to end the harassment as described above, culminating in Defendant forcing Plaintiff out of his job because it refused to create a work environment free from race-based harassment.

111.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

112.

Plaintiff is entitled to attorney fees under ORS 659A.885.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983: FOURTEENTH AMENDMENT EQUAL PROTECTION (*MONELL*)
### (AGAINST DEFENDANT EWEB)

113.

Plaintiff repeats and realleges paragraphs 1-112 as though fully set forth.

114.

At all material times the individual Defendants were acting individually and jointly under color of state law and within the scope of their employment.

115.

Defendant EWEB is liable for violation of 42 U.S.C. §1983, in violating Plaintiff's right to equal protection under the Fourteenth Amendment to the United States Constitution in one or more of the following:

(a) In maintaining official policies or widespread or longstanding practices or customs that allowed its employees and customers to engage in offensive,

COMPLAINT – Page 37

dangerous, and violent verbal and physical conduct against employees because of their race and/or national origin, including but not limited to the policies adopted August 4, 2020;

(b) In failing to maintain policies and trainings that were adequate to prevent employees and customers from engaging in offensive, dangerous, and violent verbal and physical conduct against employees because of their race and/or national origin; and/or

(c) Through its final policy-makers including Defendants Lawson and Does 1-10, taking actions and/or ratifying actions such as refusing to promote Black employees like Mr. Mulgrave, and/or refusing to "radio read" meters where lynching symbols and weapons were displayed or where customers threatened the lives of employees, such as Mr. Mulgrave, which did not respond to racial discrimination and harassment but instead ratified it.

116.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

117.

Under 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

118.

In addition to the damages described above, Plaintiff is entitled to an injunctive order against Defendant EWEB instructing it to implement policies, trainings, and procedures compliant with federal and state law to protect employees from unlawful harassment from EWEB employees and customers.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983: FOURTEENTH AMENDMENT EQUAL PROTECTION**
**(AGAINST DEFENDANTS LAWSON, STUART, AND DOES 1-10)**

119.

Plaintiff repeats and realleges paragraphs 1-118 as though fully set forth.

120.

At all material times the Defendants were acting individually and jointly under color of state law and within the scope of their employment.

121.

Defendants Lawson, Stuart, and Does 1-10 violated 42 U.S.C. § 1983, in that they violated the equal protection clause the Fourteenth Amendment to the United States Constitution in making supervisory, training, and/or policy decisions regarding one or more of the following:

   a)   In requiring meter readers, including Mr. Mulgrave to provide a doctor's note in order to avoid encountering customers who have harassed and/or discriminated against meter readers, including Mr. Mulgrave, based on their protected characteristics;

COMPLAINT – Page 39

b) In ridiculing and/or disciplining meter readers, including Mr. Mulgrave, for avoiding unsafe properties where the meter readers faced harassment and/or discrimination based on their protected characteristics;

c) In requiring meter readers, including Mr. Mulgrave, to enter properties in order to read meters, where the property owners have demonstrated lynching weapons and/or threatened meter readers based on their race and/or national origin;

d) In investigating Mr. Mulgrave rather than a white coworker who made a racially discriminatory statement against him;

e) In refusing to discipline white employees for racial discrimination, including threats of violence;

f) In refusing to provide "radio reads" or remote reads of meters on properties where the homeowners are a known danger of racial and/or national origin harassment and discrimination; and/or

g) In failing to take action regarding repeated reports of racial and/or national origin harassment and discrimination that threatened Hogon Mulgrave's life, including after an EWEB customer attempted to lynch him by lighting him on fire.

122.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe

from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

123.

Under 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983: FOURTEENTH AMENDMENT EQUAL PROTECTION**
**(AGAINST DEFENDANT BUCK)**

124.

Plaintiff repeats and realleges paragraphs 1-123 as though fully set forth.

125.

At all material times Defendant Buck was acting individually under color of state law and within the scope of his employment.

126.

Defendant Buck violated 42 U.S.C. § 1983, in that he violated the equal protection clause the Fourteenth Amendment to the United States Constitution in one or more of the following:

h)  In assigning Plaintiff more work and/or less favorable work than his white coworkers;

i)  In ridiculing and/or disciplining Mr. Mulgrave when he attempted to avoid unsafe properties where customers racially attacked him, threatened him with weapons because of his race and/or national origin, and/or displayed lynching weapons and flags threatening to Mr. Mulgrave's race;

j)  In telling Mr. Mulgrave he needed a doctor's note in order to avoid a property that displayed lynching weapons and symbols;

k)  In supporting a white woman who made a racially discriminatory statement to Mr. Mulgrave, asking that Mr. Mulgrave be investigated rather than the woman; and/or

l)  In laughing at Mr. Mulgrave after an EWEB customer tried to lynch him and blaming Mr. Mulgrave for the incident saying, "these things always happen to you."

127.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

128.

Under 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

### SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983: FOURTH/FOURTEENTH AMENDMENT SEARCH AND SEIZURE (AGAINST DEFENDANT PARKER)

129.

Plaintiff repeats and realleges paragraphs 1-128 as though fully set forth.

130.

At all material times Defendant Parker was acting individually under color of state law and within the scope of his employment.

131.

Defendant Parker violated 42 U.S.C. § 1983, in that he violated the search and seizure protections secured by the Fourth and Fourteenth Amendments to the United States Constitution in surveilling Plaintiff and using that surveillance to discipline Plaintiff.

132.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss from loss of promotional opportunities, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

133.

Under 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

### SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983: FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE
### (AGAINST DEFENDANT PARKER)

134.

Plaintiff repeats and realleges paragraphs 1-133 as though fully set forth.

COMPLAINT – Page 43

135.

At all material times Defendant Parker was acting individually under color of state law and within the scope of his employment.

136.

Defendant Parker violated 42 U.S.C. § 1983, in that he violated the equal protection clause of the Fourteenth Amendment to the United States Constitution in treating Plaintiff differently in the terms and conditions of his employment than Plaintiff's non-Black coworkers, including surveilling Plaintiff; using Plaintiff's racially humiliating experience as a training story for other coworkers; and failing to provide a safe work environment for Plaintiff, free from racial harassment.

137.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss from loss of promotional opportunities, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

138.

Under 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

**EIGHTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983: FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE**
**(AGAINST DEFENDANT LAUDERETTE)**

139.

Plaintiff repeats and realleges paragraphs 1-138 as though fully set forth.

140.

At all material times Defendant Lauderette was acting individually under color of state law and within the scope of his employment.

141.

Defendant Parker violated 42 U.S.C. § 1983, in that he violated the equal protection clause of the Fourteenth Amendment to the United States Constitution in refusing to promote Plaintiff because he is a Black man from Jamaica and using racially discriminatory language in his hiring processes, saying that although he could train a "monkey" to do work, he would not train Plaintiff.

142.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss from loss of promotional opportunities, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

143.

Under 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

### NINTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983: FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS
### (*MONELL*)
### (AGAINST DEFENDANT EWEB)

144.

Plaintiff repeats and realleges paragraphs 1-143 as though fully set forth.

145.

At all times the individual defendants were acting individually and jointly under color of state law, within the scope of their duties for Defendant EWEB.

146.

At all times, Plaintiff had a protected interest in his reputation, wages, and other benefits associated with his employment.

147.

Defendant EWEB violated 42 U.S.C. § 1983 by depriving Plaintiff of his right to procedural due process under the Fourteenth Amendment to the United States Constitution, through their hiring and promotion policies, practices, and/or customs which allow applicants who are white and have Pacific Northwest accents to be promoted over Black applicants and/or applicants whose national origin is outside of the United States, including Jamaica.

148.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe

from racial harassment. Compensation for Plaintiff's harms is to be determined by
a jury at trial.

151.

Plaintiff is entitled to reasonable attorney fees and costs under 42 U.S.C. § 1988.

150.

In addition to the damages described above, Plaintiff is entitled to an injunctive
order against Defendant EWEB instructing it to implement policies, trainings, and
procedures compliant with federal and state law to protect employees from
unlawful hiring and promotion practices.

**TENTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983: FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS**
**(AGAINST DEFENDANTS LAUDERETTE, LAWSON, STUART, AND DOES 1-10)**

151.

Plaintiff repeats and realleges paragraphs 1-150 as though fully set forth.

152.

At all times the individual defendants, Lauderette, Lawson, Stuart, and Does 1-10
were acting individually and jointly under color of state law, within the scope of
their duties for Defendant EWEB.

153.

At all times, Plaintiff had a protected interest in his reputation, wages, and other
benefits associated with his employment.

154.

Defendants, violated 42 U.S.C. § 1983 by depriving Plaintiff of his right to
procedural due process under the Fourteenth Amendment to the United States
Constitution, through their interpretation, implementation, training, or supervision

of Defendant EWEB's hiring and promotion policies, practices, and/or customs, specifically in refusing to promote Plaintiff and promoting less experienced, less skilled white people with Pacific Northwest accents instead of him for a decade.

155.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, medical expenses, a diagnosis of Complex PTSD, attempted lynching, ongoing fear for his life, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination, reporting those to Defendant, and receiving no support or response from Defendant to make Plaintiff's working environment safe from racial harassment. Compensation for Plaintiff's harms is to be determined by a jury at trial.

156.

Plaintiff is entitled to reasonable attorney fees and costs under 42 U.S.C. § 1988.

_____

WHEREFORE, Plaintiff Hogon Mulgrave prays for judgment against Defendants as follows:

    a. Economic damages in the form of expenses and lost income in an amount to be determined at trial, and prejudgment interest thereon;

    b. Fair and reasonable compensatory damages to be determined at the time of trial;

    c. Punitive damages;

    d. Reasonable attorney fees and costs incurred herein under ORS 659A.885, 42 U.S.C. § 1988, and 42 U.S.C. § 2000e-2; and

e.  An injunctive order against Defendant EWEB instructing it to

implement policies, trainings, and procedures, compliant with federal

and state law to protect employees from unlawful harassment and

discrimination based on protected characteristics.

DATED this 2nd day of August, 2021.

Meredith Holley, OSB #125647
Meredith@ErisResolution.com
LAW OFFICE OF MEREDITH HOLLEY
207 E 5th Avenue, Suite 254
Eugene, OR 97401
Telephone: (458) 221-2671
Fax: (833) 352-3615
Attorney for Plaintiff